# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |
|---|---|
| AMANDA ELLIOTT<br>595 Hydraulic Avenue<br>Coshocton, OH 43812<br><br>        Plaintiff,<br><br>v.<br><br>ALEJANDRO MAYORKAS<br>in his official capacity as<br>SECRETARY OF THE DEPARTMENT<br>OF HOMELAND SECURITY OF THE<br>UNITED STATES<br>245 Murray Lane SW<br>Washington, DC 20528-0075<br><br>        Defendant. | Case No.:_____<br><br><br><br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

## COMPLAINT

Plaintiff Amanda Elliott complains as follows against Defendant Alejandro Mayorkas and her employer, the United States Department of Homeland Security, U.S. Immigration and Customs Enforcement ("Agency," "ICE," or "Defendant"):

## NATURE OF THE CLAIM

1. This action is brought to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq.* and to remedy discrimination and retaliation Ms. Elliott experienced as a result of her protected activity and because of her sex, including her pregnancy and status as a mother.

2. On February 18, 2016, one of Ms. Elliott's supervisors, Supervisory Detention and Deportation Officer Wolfgang Nino, sexually assaulted her. Ms. Elliott reported the incident to

her employer including, among other instances, to ICE's internal complaint office, the Joint Intake Center ("JIC") on February 22, 2016, to Supervisory Detention and Deportation Officer Joann Grace, and to Field Office Director Rebecca Adducci.

3. Almost immediately after becoming aware of Ms. Elliott's protected activity, the Agency began discriminating and retaliating against her by, among other things, subjecting her to (1) unnecessary scrutiny, criticism, and delays in the review of her work; (2) derogatory comments related to her status as a mother and about her pregnancy; (3) unnecessary scrutiny and delay in the approval of her leave requests, including her leave requests during pregnancy and for childcare obligations, making it uncertain whether or not her leave would be approved; (4) a significant increase in her already heavy workload; (5) ignoring her and treating her with contempt; (6) refusing to use her maiden name and ridiculing her request to use her maiden name; and (7) causing her peers to avoid her and stop seeking her out for guidance and advice as they had previously done with the encouragement of their supervisors.

4. The harassment, retaliation, and hostile work environment to which Ms. Elliott was subjected was humiliating and dramatically and unreasonably interfered with Ms. Elliott's ability to do her job. Even after Ms. Elliott reported the Agency's harassment and retaliation, including to her Field Office Director, the Agency did nothing to protect her or stop the retaliation.

5. Through this action, Plaintiff seeks a determination that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964. Plaintiff seeks any and all appropriate make-whole relief, including backpay, correction of records, pecuniary and nonpecuniary compensatory damages, and reasonable attorneys' fees and expenses.

## PARTIES

6. Plaintiff is a female citizen and resident of Coshocton, Ohio. She has been employed by Defendant at its offices in Columbus, Ohio since 2011. Plaintiff is a protected person within the meaning of 42 U.S.C. § 2000e-2.

7. Defendant Alejandro Mayorkas, the Secretary of the United States Department of Homeland Security, has his office in the District of Columbia. He is sued only in his official capacity as the head of the Agency, as required by Title VII. 42 U.S.C. § 2000e-16(c).

8. The United States Department of Homeland Security is an agency of the executive branch of the United States government.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiff's Title VII claim pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3) because this is a civil action alleging a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

10. This Court has personal jurisdiction over Defendant Alejandro Mayorkas, in his official capacity, because, at all times relevant, Plaintiff worked for Defendant at the U.S. Department of Homeland Security offices in Columbus, Ohio.

11. Venue is appropriate in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because it is where the events or omissions giving rise to the cause of action occurred.

## EXHAUSTION

12. Plaintiff timely initiated Equal Employment Opportunity counseling on August 10, 2018, and timely filed her formal complaint of discrimination on September 20, 2018.

13. The U.S. Equal Employment Opportunity Commission Office of Federal Operations issued a Decision on August 18, 2022. Ms. Elliott is entitled to file this civil action within 90 days of the EEOC's Decision pursuant to 29 C.F.R. § 1614.407(c).

## FACTS

14. Plaintiff Amanda Elliott is a 42-year-old female United States citizen. She has been employed by the Defendant within U.S. Immigration and Customs Enforcement since 2009, and has worked as a Deportation Officer in Defendant's Columbus, Ohio office since 2011.

### Ms. Elliott Was Initially Recognized as an Excellent Employee

15. Ms. Elliott was an excellent employee who earned the respect of her colleagues and supervisors. Supervisory Detention and Deportation Officer Joann Grace, Ms. Elliott's first-line supervisor, described her as "an outstanding officer" who stood out among her peers for the quality of her work.

16. Recognizing her skill and the quality of her work product, the Agency entrusted Ms. Elliott with the most difficult "exotic" cases on its most difficult docket. Additionally, Ms. Elliott managed a much larger caseload than her peers, and the Agency relied on her to train new officers and even respond to supervisors who sought out her help.

17. Ms. Elliott consistently earned performance ratings of "Outstanding" as well as merit cash and time-off awards.

### Ms. Elliott Engaged in Protected Activity in February 2016 When She Reported that One of Her Supervisors Sexually Assaulted Her

18. On February 18, 2016, one of Ms. Elliott's supervisors, Supervisory Detention and Deportation Officer Wolfgang Nino, pinned her against her car and sexually assaulted her.

19. On February 19, 2016, Ms. Elliott reported to, and asked for help from, ICE's Employee Assistance Program regarding the incident in which SDDO Nino had sexually assaulted her.

20. On February 22, 2016, Ms. Elliott reported SDDO Nino's conduct to the Joint Intake Center, which serves as the internal complaint office within ICE.  Ms. Elliott also reported SDDO Nino's conduct to another supervisor, SDDO Grace.

21. Ms. Elliott also reported SDDO Nino's conduct to the head of the Detroit Area of Responsibility, Field Office Director Rebecca Adducci, and provided her with a corroborating witness statement from a coworker, DO Meaghan Murphy, who confirmed witnessing SDDO Nino harassing Ms. Elliott with phone calls after the assault.

22. The Agency's Office of Professional Responsibility ("OPR") completed an investigation of SDDO Nino's conduct and forwarded a referral to management finding legally sufficient grounds for "Unwanted Kissing by a Supervisor."  OPR informed Ms. Elliott that it had no say in the disciplinary process or what Agency management did with the matters that were referred to them.

**Almost Immediately After Learning that She Had Engaged in Protected Activity, Ms. Elliott's Second Level Supervisor, Mark Hamilton, Began Retaliating Against Her and Subjecting Her to a Hostile Work Environment**

23. Before Assistant Field Office Director ("AFOD") Mark Hamilton learned about Ms. Elliott's protected activity in February or March 2016, they had a good working relationship.

24. Prior to March 2016, AFOD Hamilton shared responsibility over Ms. Elliott's office on a rotating basis with other acting AFODs.  On March 22, 2016, the Agency assigned AFOD Hamilton to a long-term detail to serve as the head of the Columbus office.  In that capacity, AFOD Hamilton served as Ms. Elliott's second level supervisor.

25. As soon as AFOD Hamilton learned about Ms. Elliott's protected activity, their relationship changed dramatically and AFOD Hamilton began harassing her in retaliation for her protected activity and based on her sex (including pregnancy and status as a mother) by, among other things, subjecting her to (1) unnecessary scrutiny, criticism, and delays in the review of her work; (2) derogatory comments related to her status as a mother and about her pregnancy; (3) unnecessary scrutiny and delay in the approval of her leave requests, including her leave requests during her pregnancy and for childcare obligations, making it uncertain whether her leave would be approved; (4) a significant increase in her already heave workload; (5) ignoring her and treating her with contempt; (6) refusing to use her maiden name and ridiculing her request that he do so; and (7) causing Ms. Elliott's peers to avoid her and stop seeking her out for guidance and advice as they had previously done with the encouragement of their supervisors.

### AFOD Hamilton Subjected Ms. Elliott to an Unmanageable Workload

26. On April 4, 2016, AFOD Hamilton selected DO Affholter to serve as acting SDDO. Typically, during temporary assignments like DO Affholter's, the DOs continue responsibility for their dockets in addition to their acting supervisory responsibilities.

27. Nevertheless, between April 4, 2016 and May 31, 2016, AFOD Hamilton required Ms. Elliott to assume full responsibility for DO Affholter's entire caseload in addition to her own.

28. During this period of time, the Columbus office had approximately 120 detained cases, about 90-100 of which were "exotic" cases which were particularly complex or difficult, and only one Deportation Officer handling all of the complex cases – Ms. Elliott. By comparison, the entire Detroit office had approximately 284 detained cases and 14 deportation officers responsible for those cases for an average of slightly more than 20 cases per officer.

29. Detroit Field Officer Director Adducci commented during a deposition that it may be feasible for one officer to have 120 cases, but "some of your more exotic cases are a little bit more involved" and so a 120-case docket almost entirely comprised of exotic cases was likely "unmanageable for a single DO."

30. Ms. Elliott sought assistance with her workload from AFOD Hamilton, but he was dismissive, did nothing to help, and seemed agitated that Ms. Elliott even brought it up.

31. Instead of helping Ms. Elliott, AFOD Hamilton made her already unmanageable workload even more difficult by continually and unnecessarily over-scrutinizing and delaying the return of Ms. Elliott's work product.

### AFOD Hamilton Subjected Ms. Elliott to Near-Constant Unnecessary Scrutiny, Criticism, and Delay of her Work Product

32. After learning about Ms. Elliott's protected activity, AFOD Hamilton began unnecessarily scrutinizing, criticizing, and delaying Ms. Elliott's work.

33. Before AFOD Hamilton learned about Ms. Elliott's protected activity, Ms. Elliott was the "gold standard" and her supervisors and coworkers relied on her and valued her opinion about how to submit work.

34. AFOD Hamilton's attitude towards Ms. Elliott's work changed "like a light switch" after he learned of her protected activity. DO McDonald explained that, "[o]ne day, work product was fine, minimum corrections. The next day, it was absolute…crap."

35. DO McDonald explained that if his name was on Ms. Elliott's work product, it would come back with minimal or no corrections, but that if Ms. Elliott's name was on her work product, it would come back with several corrections, usually delayed. A coworker in the office

described AFOD Hamilton's comments as "hardly constructive at all, downright rude, and often times incredible unprofessional."

36. AFOD Hamilton's treatment of Ms. Elliott's work was so obvious and well-known that Ms. Elliott and her coworkers submitted each other's work product and/or compared AFOD Hamilton's responses to similar submissions. Repeatedly, the result was that AFOD Hamilton delayed approval of Ms. Elliott's work, to which he was critical, while quickly approving others' work.

37. On several occasions, AFOD Hamilton approved Ms. Elliott's work when submitted by her coworkers as their own, but would delay and criticize work Ms. Elliott submitted as her own that her coworkers had prepared.

38. For example, on April 27, 2016, DO Dan McDonald submitted (as his own) Ms. Elliott's work for review and signatures, and AFOD Hamilton signed and returned it the next day. DO McDonald explained, "[Ms. Elliott] and I use [*sic*] to type up Post Order Custody Review cases which went to Assistant Field Office Director Hamilton for review and signature. The ones with my name on the Post Order Custody Review were signed and returned within a day or two and the ones with her name on them were delayed by up to four days and returned saying they were done completely wrong. We had at one point traded forms where she would conduct and type up the review and I put my name on it. Those cases where (*sic*) signed and returned with no problems but when I typed up a review and she put her name on it they were again over scrutinized and delayed to the point of the Post Order Custody Review being past due which in turn would be a cause for Amanda to be punished due to the time constraints on the Post Order Custody Review."

39. As another example, after Ms. Elliott met with AFOD Hamilton on June 14, 2016, AFOD Hamilton delayed returning Ms. Elliott's very next work product, a POCR, for almost two

weeks. As DO McDonald explained, a delay of eight or nine days in approving a POCR could create "legal consequences for the Agency and the officer."

40. Also in June 2017, DO Affholter submitted under his name work product actually prepared by Ms. Elliott. On June 21, 2017, DFOD Hamilton, unaware of Ms. Elliott's involvement, praised the product as "[o]verall well written" and should be used as a "go-by" for future work products.

41. As another example, on September 20, 2017, a new DO, Scott Yarman, submitted under his own name a POCR prepared by Ms. Elliott. DFOD Hamilton, again unaware of the actual author, returned it the very next day and remarked that it was "well done and very timely." DFOD Hamilton returned the next POCR Ms. Elliott submitted for corrections.

42. At the same time DFOD Hamilton was hypercritical of Ms. Elliott's work, other supervisors continued to approve her work without issue.

### AFOD Hamilton Refused to Use Ms. Elliott's Maiden Name and Ridiculed Her Request for Safety Reasons That He Do So

43. On March 2, 2017, after a detainee's representatives referred to her by her married name, Ms. Elliott sent an email to the Columbus office asking that coworkers only communicate with her using her maiden name, Glassburn.

44. Ms. Elliott stressed the importance of her request, explaining that four non-detained ICE subjects "visited" her house the year before, when her mortgage was in her maiden name. She had recently purchased a new house with the mortgage under the married name, Elliott, and she wanted to avoid having ICE subjects being able to find her again.

45. AFOD Hamilton laughed at Ms. Elliott and said she could "absolutely not" use her maiden name, and he thereafter referred to her only as Officer Elliott around the office, despite her direct requests that he call her Officer Glassburn.

46. Other supervisors, including FOD Adducci, did not have any issue with Ms. Elliott asking that she be referred to as Officer Glassburn.

47. AFOD Hamilton's refusal to use Ms. Elliott's maiden name continued until he retired.

**DFOD Hamilton Directed AFOD Matheny to Serve Ms. Elliott With a Letter of Counseling**

48. In June 2017, DFOD Hamilton instructed AFOD Matheny to serve Ms. Elliott with a letter of counseling arising out of a High Profile Removal ("HPR") operation plan Ms. Elliott prepared and that DFOD Hamilton delayed approving.

49. Both SDDO Grace and AFOD Matheny, Ms. Elliott's first- and second-level supervisors, disagreed with the decision to issue a letter of counseling to Ms. Elliott.

50. DFOD Hamilton insisted that Ms. Elliott be given a written counseling that would go into her local personnel file, and on June 23, 2017, SDDO Grace served Ms. Elliott with the written counseling.

**DFOD Hamilton Unjustly Scrutinized and Delayed Approval of
Ms. Elliott's Leave Requests for the Birth of Her Child,
Resulting in Pregnancy Complications from Work-Related Stress**

51. On August 11, 2017, Ms. Elliott submitted to SDDO Grace her first leave request for a single day off related to her pregnancy.

52. On September 12, 2017, Ms. Elliott took one day of leave without pay related to her pregnancy. Afterwards, DFOD Hamilton quickly began researching ways to deny Ms. Elliott's leave requests.

53. On September 13, 2017, DFOD Hamilton sent a highlighted version of ICE's advanced leave policy to FOD Adducci and DFOD Lynch, and incorrectly argued that Ms. Elliott could only get a limited amount of advanced sick leave because she had a negative leave balance. DFOD Hamilton's statements were contrary to the policy President Obama put in place on January 15, 2015, specifically directing Agencies to provide this advanced leave…irrespective of existing leave balances.

54. Due at least in part to the stress caused by DFOD Hamilton's treatment and the difficulty she had getting her leave approved, Ms. Elliott developed pregnancy complications and her doctor placed her on modified bed rest on December 7, 2017.

55. Ms. Elliott submitted her initial requests for leave related to the anticipated birth of her child on December 15, 2017.

56. Although leave associated with birth or adoption is typically approved by the employee's first-line supervisor, DFOD Hamilton, who had been promoted to Deputy Field Office Director in June 2017, unusually and unnecessarily inserted himself into the approval process for Ms. Elliott's leave.

57. After denying Ms. Elliott's first and second leave requests, DFOD Hamilton finally approved her maternity leave on January 4, 2018 – nearly a month after her initial request and three days after she had already started her planned medical leave – after being urged to do so by Ms. Elliott's first-line supervisor who had to ask Ms. Elliott to come into the office from leave to finalize her leave request.

### DFOD Hamilton Interfered with Ms. Elliott's Intermittent Leave

58. Ms. Elliott returned to work earlier than originally planned on March 19, 2018, with approximately four weeks of unused leave remaining pursuant to the leave package that had

been approved on January 4, 2018, because Ms. Elliott knew she would need the leave to care for her daughter who had been born with health problems. Ms. Elliott's approved FMLA leave allowed for her to use the leave intermittently.

59. After Ms. Elliott returned to work following the birth of her child, DFOD Hamilton again inserted himself into her leave requests and interfered with her use of already approved intermittent leave.

60. For example, in response to her July 16, 2018 leave request, SDDO Rippe informed Ms. Elliott that, "every time I approve your leave, "Detroit" says it's a problem and it's not a bank you can draw from." Ms. Elliott understood "Detroit" to mean DFOD Hamilton.

61. SDDO Rippe further told Ms. Elliott on July 16, 2018, that she needed to keep her leave to a minimum and that if she had an appointment she would have to go after hours or leave and come back to make up the time – an impossibility because she lived too far from the office to be able to go home, pick up her child, take them to the doctor and back, then return to the office.

62. When Ms. Elliott requested leave again on July 26, 2018, SDDO Rippe told her "Detroit" would not approve it.

63. By comparison, Ms. Elliott had never had any issues using intermittent leave after returning to work following the birth of her first child in 2015.

64. Similarly, Ms. Elliott's coworker, Scott Yarman, was able to use intermittent leave without issue following the birth of his child, and his leave was regularly approved without issue after giving his supervisor just 24 hours' notice. Likewise, Mr. Yarman's parental leave package was approved in just 15-20 minutes as compared with the nearly three weeks it took for Ms. Elliott.

65. As a result of DFOD Hamilton's interference with Ms. Elliott's ability to use her approved intermittent leave, Ms. Elliott experienced a constant state of uncertainty as to whether

she would be allowed to take care of her and her children's medical care, or whether she would be disciplined for using the leave she had already been granted permission to use.

66. On other occasions, DFOD Hamilton forced Ms. Elliott to deduct leave from her leave balance rather than using leave without pay pursuant to her approved leave package.

67. On other occasions, Ms. Elliott's leave requests were denied and she ended up having to work on days she sought leave.

## STATEMENT OF THE CLAIMS

### COUNT I

**Hostile Work Environment and Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as Amended**

68. Plaintiff repeats and re-alleges all previous paragraphs of this Complaint.

69. As set forth in the numbered paragraphs above, Ms. Elliott engaged in conduct protected by Title VII when she reported that one of her supervisors, SDDO Nino, sexually assaulted her. Specifically, Ms. Elliott made protected reports to ICE's internal complaint office, the Joint Intake Center ("JIC"), on February 22, 2016, to another one of her supervisors, SDDO Grace, and to the head of the Detroit Area of Responsibility, Field Office Director Adducci.

70. After enduring several months of retaliation, Ms. Elliott also reported the retaliation to which she was subjected including, among other instances, to SDDO David Walters on June 8, 2016, saying that AFOD Hamilton's actions "[l]ook[] a lot like retaliation for filing [a JIC report against SDDO Nino.]"

71. As a result of Ms. Elliott engaging in this protected activity, Defendant retaliated against her through a series of materially adverse actions that would dissuade a reasonable person from engaging in protected activity. These retaliatory actions included, among other things: (1)

subjecting her to unnecessary scrutiny, criticism, and delays in the review of her work; (2) derogatory comments related to her status as a mother and about her pregnancy; (3) unnecessary scrutiny and delay in the approval of her leave requests, including her leave requests during pregnancy and for childcare obligations, making it uncertain whether or not her leave would be approved; (4) a significant increase in her already heavy workload; (5) ignoring her and treating her with contempt; (6) refusing to use her maiden name and ridiculing her request to use her maiden name; and (7) causing her peers to avoid her and stop seeking her out for guidance and advice as they had previously done with the encouragement of their supervisors.

72. In addition to other direct and circumstantial evidence of motive such as comments made by Ms. Elliott's supervisors and coworkers, the temporal proximity between Ms. Elliott's protected activity and the Defendant's retaliatory actions demonstrates causal connection.

73. The overall circumstances and retaliatory harassment were not only likely to deter a reasonable person from engaging in protected activity, but were so severe and pervasive as to substantially and negatively alter the terms and conditions of Ms. Elliott's employment with the Agency, creating a hostile and abusive work environment.

74. As a direct and proximate result of the retaliation to which she was subjected, Ms. Elliott suffered damages for which she should be compensated in an amount to be determined at trial.

## COUNT II

**Hostile Work Environment and Discrimination on the Basis of Sex in
Violation of Title VII of the Civil Rights Act of 1964, as Amended**

75. Plaintiff repeats and re-alleges all previous paragraphs of this Complaint.

76. Between February 2016 and August 2018, the Agency subjected Ms. Elliott to discrimination and a hostile work environment on the basis of sex by, among other things, subjecting her to (1) unnecessary scrutiny, criticism, and delays in the review of her work; (2) derogatory comments related to her status as a mother and about her pregnancy; (3) unnecessary scrutiny and delay in the approval of her leave requests, including her leave requests during pregnancy and for childcare obligations, making it uncertain whether or not her leave would be approved; (4) a significant increase in her already heavy workload; (5) ignoring her and treating her with contempt; (6) refusing to use her maiden name and ridiculing her request to use her maiden name; and (7) causing her peers to avoid her and stop seeking her out for guidance and advice as they had previously done with the encouragement of their supervisors.

77. The harassment directed at Ms. Elliott was because of her sex, including her pregnancy and status as a mother. Male and non-parent employees were not exposed to comparable abuse.

78. The overall circumstances and harassment were so severe and pervasive as to substantially and negatively alter the terms and conditions of Ms. Elliott's employment with the Agency, creating a hostile and abusive work environment.

79. As a direct and proximate result of Defendant's discrimination, Ms. Elliott suffered damages for which she should be compensated in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against the Defendant as follows:

A. Declare that the Defendant violated the Plaintiff's rights under Title VII of the Civil Rights Act of 1964;

B. Order the Defendant to adopt and implement policies, procedures, and practices that will protect employees from harassment on the basis of sex and retaliation for engaging in protected activity;

C. Award Plaintiff make whole relief including, without limitation, backpay, correction of records, and pecuniary and non-pecuniary compensatory damages;

D. Order the Defendant to pay the Plaintiff's reasonable attorneys' fees, costs, and expenses; and

E. Order all other legal and equitable relief as many be just and proper.

## JURY DEMAND

Plaintiff requests a jury trial for all claims that may be tried to a jury.

DATED: November 16, 2022

                                    Respectfully Submitted,

                                    */s/ Katherine Daughtrey Neff*
                                    Katherine Daughtrey Neff (Ohio Bar No. 0082245)
                                    FREKING MYERS & REUL LLC
                                    600 Vine Street, 9th Floor
                                    Cincinnati, Ohio 45202
                                    Phone: 513-721-1975
                                    Fax: 513-651-2570
                                    Email: KNeff@fmr.law

                                    Heidi R. Burakiewicz
                                    (*Pro Hac Vice* Application Forthcoming)
                                    Kalijarvi, Chuzi, Newman & Fitch. P.C.
                                    818 Connecticut Ave NW, Suite 1000
                                    Washington, DC 20006
                                    Phone: (202) 331-9260
                                    Fax: (877) 219-7127
                                    Email: hburakiewicz@kcnlaw.com

                                    *Counsel for Plaintiff*